UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-------------------------------------------------------X
:
**ENVOY TECHNOLOGIES, INC.,**           :
:
        **Plaintiff,**           :   24-cv-00220 (SRC)(CLW)
:
:
v.           :
:
**CUBIC CORPORATION,**           :   **JURY DEMANDED**
:
        **Defendant.**           :
-------------------------------------------------------X

## SECOND AMENDED COMPLAINT

Plaintiff, through its attorneys, for its Second Amended Complaint against the Defendant, alleges:

## JURISDICTION AND VENUE

1. This is a cause of action for Copyright infringement arising under the Copyright Laws of the United States, 17 U.S.C. §101 et. seq. and for breach of contract.

2. Jurisdiction of the subject matter of this action is conferred on this Court by, at least, 28 U.S.C. §§ 1331, 1332, and 1338(a), and this dispute involves the Federal Question of copyright infringement, there is diversity of citizenship, and the dispute involves an amount well over $75,000, and is believed to involve at least

several million dollars.

3. This Court has personal jurisdiction over Defendant because transacts business within this district, derives substantial revenue from intrastate and interstate commerce and has committed tortuous acts within this district and also without this district having injurious consequences within this district, and Defendant is otherwise within the jurisdiction of this Court. In addition, this Defendant has contractually agreed to personal jurisdiction in this Court.

4. Venue is proper in this judicial district pursuant to, at least, 28 U.S.C. §§1391 and 1400(a).

## THE PARTIES

5. Plaintiff Envoy Technologies, Inc. (hereinafter "Envoy"), is a Delaware corporation with its principal place of business at 1115 Inman Avenue, Edison, NJ 08820, New Jersey.

6. Envoy is a software company that licenses, *inter alia*, a product known as XIPC.

7. XIPC is comprised of a large number of modules and libraries, which together, make up an advanced software toolset for the development of multitasking and distributed enterprise applications. XIPC provides fault-tolerant management of guaranteed delivery and real-time message queuing, translation services, and

other related messaging services.

8. Defendant Cubic Corporation is a Corporation having a principal place of business at 9233 Balboa Avenue, San Diego, California, 92123.

9. Envoy and Cubic are parties to a Master Product Agreement ("MPA"), which included an Original Equipment Manufacturer Addendum ("OEMA"), and a subsequently signed MPA Amendment ("Amendment") that amended the MPA (Collectively, the "License").

10. The OEMA granted Cubic certain Deployment Licenses to distribute (e.g.; deploy) XIPC to its customers as part of Cubic developed applications.

11. Although Cubic was not the original signatory to the License, Cubic acquired the original licensee, or alternatively received assignment of the License from the original licensee, and is subject to all of the rights and obligations of said License. Hence, this document refers to "Cubic" throughout to mean Cubic or its predecessor in interest and original licensee, Naztec, as applicable.

12. Envoy and Cubic are also parties to a series of Annual Contracts ("AC"), one per year, beginning in or about 2004. The ACs provide, *inter alia*, that Cubic could use the XIPC software, on single CPU computers only, for one year, and also allowed Cubic to deploy the software on single CPU computers of its customers.

## FACTUAL BACKGROUND

13. Envoy is the owner by assignment of certain XIPC software and associated

registered copyrights in the XIPC software.

14. The License provides Cubic with both development and deployment licenses for installation and use of XIPC software on "Single CPU Computers." The negotiated fee for both types of licenses was highly discounted due to the limitation in the license allowing installation, use, and customer deployment on relatively low-end single CPU computers only.

15. Each year after signing the License, Cubic and its predecessor entered into a separate AC for "License Renewal" for further installation, use and deployment of XIPC on "single CPU computers." Samples of some of such AC's are attached here at Ex. A.

16. The AC's would be entered by Envoy sending an offer for another year of use in the form of either a quote or a prepayment request, and Cubic accepting such quote or invoice by stating so or remitting the amount of the quote or invoice.

17. Envoy also licenses XIPC for use on higher end computers that have multiple cpu's ("multi-cpu"), but those licenses cost significantly more money.

18. Prior to entering into the License, in or about May or June of 2002, Cubic was advised of the various licenses Envoy offered, all at different prices. For example, Envoy offered Cubic a license for use of XIPC on certain higher end multi-CPU computers, for use on servers, for use on single CPU computers, and others, each of which was at a significantly different price.

19. In or about May or June of 2002, Cubic, through at least its employee Bryan Beyer, represented that its installation and use, both during deployment and in its development environment, would be limited to single CPU computers, so the parties entered the License, which limited Cubic's use to single-CPU computers only, and which reflected Envoy's pricing for single-CPU computers.

20. Cubic later began installing and using the XIPC software on multi-CPU computers in its development environment, and Cubic also began installing and using XIPC on multi-CPU computers of its customers when deploying XIPC. Neither Cubic nor Mr. Beyer ever corrected the representations Mr. Beyer it made to Envoy prior to the License being entered, namely, that its installation, use in development and deployment environments was going to be limited to single CPU computers only.  Cubic knew that Envoy was relying upon Cubic's original representation in entering into each AC agreement, yet remained purposefully silent about its expansion beyond single-CPU computers – Cubic purposely failed to correct its representation so that it could continue paying reduced fees in each AC agreement.

21. Each year, prior to accepting Envoy's written offer to renew the License for single-CPU computers only for another year, Cubic reviewed such written offer that specifically stated "Single-CPU Computers" or similar language.

22. Cubic thus knew that Envoy was entering each AC agreement each year

5

under the mistaken belief that Cubic was installing, using and deploying the XIPC software only on single CPU computers, but Cubic remained purposely silent in order to gain the benefit of reduced pricing in the AC agreement each year. Cubic made the decision not to disclose to Envoy that it was actually deploying, installing and using the XIPC software on multi-cpu computer systems, including its own and those of its customers, because Cubic knew that such use would require a much more expensive license.

23. With respect to the Deployment Licenses, OEMA ¶ 8 provided that Cubic "will not deliver any Product(s) (including any portion of the Product(s) embedded in OEM's Applications) to any prospective customer…unless the Product(s) have been authorized by Licensor for the use, computers and platforms identified by the customer."

24. Nonetheless, Cubic knowingly delivered XIPC to numerous customers who identified multi-cpu computers on which XIPC would be used, even though such platforms and computers were not within the License, and even though knowingly delivering XIPC to such customers was a violation of OEMA ¶ 8. Further, Cubic knowingly installed XIPC for those customers, and assisted and trained such customers on how to use those systems.

25. Cubic also knowingly deployed XIPC to customers by: 1) delivering to the customer a multi-cpu server Cubic itself had procured, 2) delivering that multi-cpu

server to the customer with XIPC having already been installed by Cubic; 3) using XIPC on that server when Cubic was there to train its customer, and 4) training the customer how to use XIPC on that server, with the intent that such customer would do so. An example of Cubic deploying XIPC in this manner is attached here at Ex. B.

26. For the entire time period Cubic was deploying XIPC as described above, it continued purposely misleading Envoy to believe its use and deployment continued to be limited to single CPU computers only, continuing to rely upon its original representations made during negotiation of the License.

27. These purposeful acts and omissions included, but are not limited to, not correcting Cubic's prior misrepresentations of continuing to deploy XIPC for single-CPU computers only, and by not correcting Envoy's repeatedly conveyed belief in each AC offer that Cubic's use and deployment was limited to single-CPU systems only.

28. In addition, in or about February, 2010, and in its continuing efforts to discourage Envoy from pursuing its rights and discovering Cubic's breaches, Cubic misrepresented to Envoy that its gross revenue from XIPC was only approximately $50,000 per year. This misrepresentation was purposefully made to dissuade Envoy from auditing Cubic's activities under the License, because such an audit or potential claims would not be financially justified. However, after Envoy was alerted to the

Cubic's activities, it became clear that Cubic's annual revenue from XIPC was one or two orders of magnitude higher than that which Cubic had claimed.

### CUBIC'S FURTHER MISREPRESENTATIONS AND OMMISSIONS

29. At or about the time the parties' entered the License, Cubic's representative Mr. Beyer represented to Envoy that Cubic's installation, use and deployment of XIPC would be on single CPU computers only, the result of which was that Cubic received the benefit of a highly discounted price for its license to XIPC.

30. At the time Cubic entered the Amendment, and at the time Cubic entered each of the AC contracts, Cubic knew the representation it had made in the immeitate prior paragraph above was not true. Cubic thus had a legal duty to speak to correct the misrepresentation, and Cubic's failure to correct its previous representation, known to be false when made or to have become false, was thus fraudulent pursuant to extensive New Jersey case law.

31. At the time Cubic entered the Amendment and at the time Cubic entered each of the AC contracts, Cubic knew that Envoy was proceeding under an incorrect and/or mistaken belief that Cubic's installation and use of XIPC was, and would be, limited to Single-CPU computers only. Cubic knew so because in each case, Envoy

supplied an offer that stated "Single CPU Computers" or substantially similar language.

32. Whether Cubic's installation and use of XIPC would be limited to single CPU computers was a fact "basic to the transaction" for the License, Amendment and each AC contract at the respective times of such contracts being entered, such that Cubic had a duty to correct it. Cubic's failure to correct Envoy's incorrect understanding of Cubic's ongoing installation and use of XIPC, and Cubic's purposeful perpetuation of Envoy's incorrect understanding, constitutes fraud pursuant to extensive New Jersey precedent.

33. In addition, in 2010, in order to convince Envoy that pursuing its rights was not cost justified, Cubic misrepresented to Envoy that it had gross annual revenue from XIPC of approximately fifty-thousand dollars. This misrepresentation was known by Cubic to be blatantly false, as evidenced by Envoy later learning Cubic's relevant annual revenue was at least one or two orders of magnitude greater. This misrepresentation was intended to convince Envoy that pursuit of any audit or legal claims against Cubic would not be cost justified, thereby avoiding Envoy discovering that the Single CPU claimed use was false.

34. In 2006, Cubic advised Envoy that it was using the XIPC software beyond the scope of the "WindowsNT/95" platforms specified in the Amendment. (Dkt# 14-2). The parties' thus expanded the scope of the License to cover such additional

use, but such expansion required an upgrade fee, that Cubic paid.

35. However, when Cubic later further expanded its installation and use of XIPC into multi-cpu computers, apparently recognizing from its 2006 experience it would have to pay another upgrade fee, and knowing such fee would be much more significant, Cubic purposefully concealed this further expansion to multi-cpu use in order to avoid what it knew would be higher licensing fees.

36. Cubic's concealments and further misrepresentations outlined above were also made at least by the same Mr. Beyer that negotiated and signed the 2002 License, and possibly by others.

37. As soon as Envoy learned of Cubic's misrepresentations in 2021, and that Cubic's use of XIPC was not what Cubic had been consistently misrepresenting it to be, Envoy diligently took immediate and active steps to negotiate a resolution with Cubic, writing to Cubic to request the issue be resolved, attempting to negotiate an additional payment for Cubic's use, installation, and deployment of XIPC that breached and went beyond the License and AC agreements.  The parties engaged in significant settlement discussions and correspondence for just over a year, before it became clear that resolution could not be reached.

38. During those discussions and attempted resolution, Envoy sought to ascertain the true scope of Cubic's use, but Cubic was entirely uncooperative and continued its, now known, active concealment of its true uses of XIPC.

39. When Envoy determined resolution could not be reached, it promptly filed this lawsuit to pursue its rights.

40. Based upon Cubic's numerous fraudulent misrepresentations and omissions that led Envoy to believe Cubic was installing, using, and otherwise deploying XIPC on single-CPU computers only, and only to a very limited extend of approximately $50,000 annually, as well as Envoy's prompt diligence, once it learned of the real facts, in immediately approaching Cubic to negotiate a resolution and then suing substantially immediately when resolution could not be reached, the discovery rule and equitable tolling apply to Envoy's claims herein.

### **FIRST CAUSE OF ACTION – BREACH OF CONTRACT**

41. Envoy repeats and re-alleges all of the above allegations as if fully set forth herein.

42. Cubic's internal installation and use of the XIPC software on its own multi-cpu computer systems, in its development environment used to develop applications with XIPC, is in violation of Sections 1.1, 9.3, and Schedule 1 of the MPA. More specifically, Section 1.1 allowed Cubic to use the Products for internal use, and Section 9.3 defined one of those Products, the Developer Toolset, as "the form of the Products identified in the Schedule(s) as licensed for use in a development environment." The referenced Schedule then defines the form of products for use in a development environment (e.g.; internal use) as "XIPC Developer Toolset of

11

WinNT on Group C [and] Group B platforms.' (Dkt# 14-2, p. 7).

43. As Cubic was aware, Group B and Group C computers are all single-CPU computers, but Cubic did not limit its use of XIPC to Group B or Group C computers. Cubic later installed and used XIPC on multi-cpu computers in its development environment that would have required a much more expensive license. Cubic did so while representing to Envoy, through its above-described fraudulent conduct, that its use was limited to single-CPU computers only.

44. Cubic's installation and use of XIPC on the computers of its customers during deployment, as described above, also violated the specific restriction in the Amendment that limited the Deployment licenses to "Single-CPU computers." (Dkt# 14-2, at p. 13).

45. Cubic also breached Section 8, Paragraph 2, of the OEMA, which required that Cubic "not deliver any Product(s) (including any portion of the Product(s) embedded in OEM's Applications) to any prospective customer…unless the Product(s) have been authorized by Licensor for the use, computers and platforms identified by the customer." Cubic delivered XIPC to many customers that identified multi-cpu computers on which XIPC would be used, in violation of the aforementioned Section of the OEMA.

46. Cubic's own installation and use of the XIPC software on its development systems that were not Group B or Group C computers, and Cubic's own delivery to,

12

installation of and use of XIPC on its customers' multi-cpu computers all breached the above identified sections of the License and Amendment.

47. In addition, each of the Envoy offers accepted by Cubic to form each of the annual AC contracts was also limited to "Single CPU Computers" (e.g.; Ex. A, pp. 23, 31, see "Description" section.).

48. Cubic breached each of these contracts when, after accepting it, it installed, used, and deployed XIPC on multi-cpu computers of its customers, not in a development environment, all of which violated these AC contracts that were limited to "Single CPU Computers" as well as the above cited sections of the License and Amendment.

## SECOND CAUSE OF ACTION – COPYRIGHT INFRINGEMENT

49. Envoy repeats and re-alleges all of the above allegations as if fully set forth herein.

50. Upon information and belief, Cubic is using, and has used, XIPC for years on multi-cpu computers in its development environment, which computers are not Group B or Group C computers per the License, and which are thus unlicensed.

51. Cubic has also itself installed and used XIPC on its customers' multi-CPU computers, despite that Cubic has no license to do so.

52. Cubic's installation and use of XIPC on multi-cpu computers of its customers, and on its own computers that are not Group B or Group C computers, is

13

not licensed, and constitutes direct copyright infringement of Envoy's registered copyrights in its XIPC software.

53. Cubic's copyright infringement has been knowing and willful, and with willful disregard for Envoy's rights, and has been purposefully kept secret by Cubic's failure to inform Envoy of its expansion of use of XIPC beyond the licensed single-CPU computer limitation.

### THIRD CAUSE OF ACTION – VICARIOUS LIABILITY FOR COPYRIGHT INFRINGEMENT

54. Envoy repeats and realleges all of the above allegations as if fully set for the herein.

55. After Cubic installed and used the XIPC software on multi-cpu systems of its customers, Cubic instructed and trained its customers on how to use the XIPC software on their multi-cpu computers.

56. Throughout the entire relevant time period Cubic was doing so, Cubic had the right, ability, and even the obligation, to supervise or control the infringing activity of its customers. More specifically, pursuant to OEMA § 8, Cubic was required to refrain from delivering the XIPC software to any prospective customer unless the "Product(s) have been authorized by the Licensor for the use, computers, and platforms identified by the customer."

57. Upon information and belief, had Cubic informed its customers that use of

14

its product with the XIPC software was allowed only on single-CPU computers, many of its customers would not have purchased the Cubic product with the XIPC software, and Cubic would have lost the money it earned from such customers, because such customers needed to use the Cubic product with the XIPC software on multi-cpu computers.

58. Cubic thus had a direct financial interest in the customers purchasing the relevant Cubic products incorporating the XIPC software, and using them in multi-cpu computers, outside the scope of any license Envoy granted, and, therefore, in an infringing manner.

59. Cubic had a direct financial interest in concealing from its customers the single CPU restriction, in order to gain more sales, so it provided the XIPC software knowing and desiring that it be used in an infringing manner.

60. Instead of complying with its obligation to avoid delivering XIPC to customers that would use it on multi-cpu computers, Cubic installed XIPC on multi-cpu computers for its customers, and then trained these customers on how to use XIPC on the multi-cpu computers.

61. Cubic is thus vicariously liable for the direct infringement of its customers that Cubic purposely supplied with the XIPC software for use on multi-cpu computers.

## FOURTH CAUSE OF ACTION – COPYRIGHT INFRINGEMENT

## BY INDUCEMENT

62. Envoy repeats and realleges all of the above allegations as if fully set for the herein.

63. Many of Cubic's customers, to whom Cubic supplied the XIPC software, used the XIPC software on multi-cpu computers without a license to do so, and thus infringed the XIPC copyrights.

64. Cubic knew at the time it supplied the XIPC software to its customers that the customers would use it on multi-cpu computers, and that such use was not licensed and infringed Envoy's copyright rights.  Cubic knew so because Cubic either itself supplied the customer with the multi-cpu computers with XIPC installed, or because Cubic trained its customer how to use XIPC by demonstrating it on the customer's multi-cpu computers on which it would use XIPC.  (

65. For example, Ex. B shows a township in California purchased a Cubic system that, upon information and believe, includes both a multi-cpu computer and XIPC installed on it.  (Ex. B, p. 11).  As shown at Ex. B, Cubic also was using that system itself to provide training services to that customer.

66. Cubic also knew it had contractually obligated itself to restrict the customer's use to single CPU computers, but did not do so, in order to gain more sales, and with the intent that such customers would use the XIPC software in an unlicensed manner.

67. Cubic materially contributed to and induced the infringements of its customers by purposefully providing the XIPC software to them without any restriction on its use under the parties' License, absent which the customers would not have been able to infringe Envoy's copyrights.

68. As a result of at least the foregoing conduct, Cubic is liable for contributing to and inducing the direct copyright infringements of its customers.

**WHEREFORE**, Envoy requests the Court grant the following relief:

A.  An injunction, prohibiting Cubic, its employees, owners, members, agents, servants, related companies, and all persons and/or entities in privity with them, from infringing Envoy's copyright in the XIPC software by using such software in its systems;

B.  Damages under 17 U.S.C. § 504, in the form of statutory damages, profit disgorgement, actual damages, and attorneys' fees, as the Court deems appropriate and/or as elected by Envoy;

C.  Damages for breach of contract, in an amount to be determined at trial;

D.  An order requiring Cubic to deliver to Envoy any copies of any portions of the XIPC software in its possession, and destroy any on computer systems containing such copies if such software is not removed from them, including those copies Cubic or its predecessor installed on any customer computer systems;

E. Such other and further relief as the Court deems just and proper.

/s/ Jeffrey I. Kaplan
Jeffrey I. Kaplan (JK 4706)
Michael R. Gilman (*pro hac vice*)
**KAPLAN BREYER SCHWARZ LLP**
317 George Street. Ste 320
New Brunswick, New Jersey
732-578-0103 x231 (voice)
JKaplan@kbsiplaw.com

*Attorneys for Plaintiff Envoy Technologies, Inc.*

December 20, 2024