<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| ENVOY TECHNOLOGIES, INC., | : : : | **Civil Action No. 24-220 (SRC)** |
| Plaintiff, | : : | |
| v. | : : | **OPINION & ORDER** |
| CUBIC CORPORATION, | : : | |
| Defendant. | : : : : | |

<u>**CHESLER**</u>, District Judge

This matter comes before the Court on Defendant Cubic Corporation's ("Defendant" or "Cubic") motion to dismiss the second amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) (the "Motion"), (Dkt. No. 46). Plaintiff Envoy Technologies, Inc. ("Plaintiff" or "Envoy") opposed the Motion and Defendant filed a reply brief in further support of its Motion. The Court reviewed the papers submitted and proceeds to rule without oral argument, pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, Defendant's Motion is **GRANTED**.

**I.    PROCEDURAL HISTORY**

On January 12, 2024, Plaintiff filed a complaint against Defendant. (Dkt. No. 1.) Defendant moved to dismiss the original complaint on August 12, 2024. (Dkt. No. 14.) Plaintiff then filed an amended complaint on August 23, 2024, (Dkt. No. 17), and Defendant moved to dismiss the first amended complaint on September 6, 2024, (Dkt. No. 21). On November 15, 2024, this Court entered an order granting Defendant's motion to dismiss the first amended complaint

without prejudice and granted Plaintiff leave to replead the dismissed counts within thirty days. (Dkt. No. 41.)

Plaintiff filed a second amended complaint ("Second Amended Complaint") on December 20, 2024.[1] (Dkt. No. 44 ("SAC").)  Defendant filed the present Motion on January 17, 2025. (Dkt. No. 46 ("Mot.").)  Plaintiff filed an opposition to the Motion on February 24, 2025, (Dkt. No. 50 ("Opp'n Br.")), and a corrected version of its opposition brief with the consent of the Court on March 4, 2025, (Dkt. No. 53).  Defendant filed a reply brief on March 10, 2025.  (Dkt. No. 54 ("Reply").)

Through its Motion, Defendant seeks a dismissal of Plaintiff's Second Amended Complaint on the grounds that it fails to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## II.   FACTUAL BACKGROUND

This case arises from a dispute between the parties to a 2002 Master Product Agreement ("MPA"), which included an Original Equipment Manufacturer Addendum ("OEMA"), and a 2003 amendment (the "Amendment") to the MPA (collectively, the "License").  (SAC ¶ 9.) Defendant is not named on the License because it acquired the original signatory to the License, Naztec, and has since been subject to all the rights and obligations of the License.  (Id. ¶ 11.)

Plaintiff is a software company and "owner by assignment of certain XIPC software and associated registered copyrights in the XIPC software," which it licenses to other companies.  (Id. ¶¶ 6, 13.)  XIPC "is comprised of a large number of modules and libraries, which together, make

---

[1] Plaintiff also filed a motion to amend/correct Exhibit A of the Second Amended Complaint, (Dkt. No. 45), which the Court granted on January 21, 2025, (Dkt. No. 47).

up an advanced software toolset for the development of multitasking and distributed enterprise applications." (Id. ¶ 7.)

Prior to entering the License, in May or June of 2002, Defendant, through its employee, represented to Plaintiff that its use of the License, "both during deployment and in its development environment, would be limited to single CPU computers." (Id. ¶ 19.) The parties' License grants Defendant a development and deployment license for the installation and use of XIPC on "Group C and Group B platforms." (Id. ¶¶ 14, 42.) According to Plaintiff, Group B and Group C platforms are "single-CPU computers." (Id. ¶ 14.) Plaintiff alleges that "[t]he negotiated fee for [Defendant's License] was highly discounted due to the limitation in the license allowing installation, use, and customer deployment on relatively low-end single CPU computers only." (Id.) Plaintiff also licenses its XIPC software for use on higher-end computers, but states that "those licenses cost significantly more money." (Id. ¶ 17.)

Under the MPA, Defendant was licensed to install Plaintiff's XIPC software on Group B and C platforms in its development environment. (Id. ¶¶ 14, 20, 42.) The OEMA then granted Defendant limited deployment licenses to distribute XIPC to its own customers as part of Defendant-developed applications and also created certain responsibilities for Defendant such as the responsibility that Defendant "will not deliver any Product(s) (including any portion of the Product(s) embedded in OEM's Applications) to any prospective customer . . . unless the Product(s) have been authorized by Licensor for the use, computers and platforms identified by the customer." (Id. ¶¶ 23, 44–45.) The 2003 Amendment allowed Defendant to grant an unlimited number of Plaintiff's deployment licenses to its customers without needing to track or report the deployments.

In 2006, Cubic and Envoy expanded the scope of the License because Cubic was using the XIPC software "beyond the scope of the 'WindowsNT/95' platforms specified in the Amendment," which resulted in Defendant paying an upgrade fee. (Id. ¶ 34.) Plaintiff alleges that Defendant later expanded its installation and use of XIPC to multi-CPU computers but concealed this expansion from Plaintiff to avoid paying an additional upgrade fee as it did in 2006. (Id. ¶¶ 34–35.)

In addition to the License, Plaintiff alleges that each year after signing the License, Defendant entered into a separate "annual contract" for a "License Renewal" "for further installation, use and deployment of XIPC on "single CPU computers." (Id. ¶ 15.) The Second Amended Complaint attaches samples of these "annual contracts" as Exhibit A. Exhibit A consists of various invoices from Plaintiff to Defendant/its predecessor, Naztec, for an item code of "xipc-mt" with descriptions of "Annual License for Unlimited XIPC Deployments for" "All Supported Windows Platforms Single CPU Computers" or "WinNT/95 Single CPU Computers." (Dkt. No. 45-2, Ex. A.) Plaintiff alleges these invoices constitute contracts between the parties. (SAC ¶¶ 15–16.)

The crux of Plaintiff's complaint is that Defendant installed the licensed XIPC software on "multi-CPU computers" that were unlicensed during its development process and later, its deployment processes to customers. Plaintiff alleges that Defendant's use of the licensed software on unlicensed computers breached the License and infringed Plaintiff's copyright. Plaintiff further alleges that Defendant breached the License by "knowingly" deploying the XIPC software to Defendant's customers on unlicensed computers, which resulted in Defendant's customers also infringing Plaintiff's copyright. (Id. ¶ 25.) Plaintiff alleges that Defendant did so while concealing

the single-CPU use restriction in the License from its customers to gain a profit. (Id. ¶¶ 58–59, 66–67.)

In the twenty plus years since signing the License, Plaintiff alleges that Defendant never corrected its representations about limiting use of XIPC to "single-CPU computers" and that Defendant "knew that Envoy was relying upon Cubic's original representation in entering into each" annual contract/invoice so that it could "continue paying reduced fees." (Id. ¶ 20.)

In February 2010, Defendant told Plaintiff that its gross revenue from use of the XIPC software was $50,000, which Plaintiff alleges was a misrepresentation used in an effort by Defendant to "dissuade Envoy from auditing Cubic's activities under the License." (Id. ¶ 28.) Plaintiff states after it "was alerted" about Defendant's activities, "it became clear that Cubic's annual revenue from XIPC" was more than $50,000. (Id.)

In 2021, Plaintiff learned of Defendant's alleged misrepresentations and took steps to negotiate a resolution by writing to Defendant and attempting to negotiate an additional payment for Defendant's "use, installation, and deployment of XIPC" that went beyond the permitted uses in the License. (Id. ¶ 37.) The parties corresponded for a year about potential settlement options but were unsuccessful and Plaintiff subsequently filed suit. (Id. ¶¶ 38–39.)

The Amended Complaint asserts four causes of action: (I) Breach of Contract; (II) Copyright Infringement; (III) Vicarious Liability for Copyright Infringement; and (IV) Copyright Infringement by Inducement. Defendant now moves to dismiss all counts of the Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).

## III. LEGAL STANDARD

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. On a Rule 12(b)(6) motion, the Court must accept as true the well-pleaded facts of a complaint and any reasonable inference that may be drawn from those facts but need not credit conclusory statements couched as factual allegations. See id. ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The issue before the Court on a Rule 12(b)(6) motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1420 (3d Cir. 1997) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). "[A] district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." Id. at 1426. The Court, however, may properly consider documents that form the basis of a claim and documents that are "integral to or explicitly relied upon in the complaint." Id. (citations omitted).[2]

The Third Circuit instructs that courts should take three steps in determining the sufficiency of a complaint: (1) "the court must 'tak[e] note of the elements a plaintiff must plead to state a

---

[2] For purposes of this motion, the Court also relies on (1) the June 10, 2002 MPA, (2) the June 10, 2002 OEMA, and (3) the April 1, 2003 Amendment attached to the Declaration of Stuart E. Pollack, (Dkt. No. 14-2), filed in support of Defendant's motion to dismiss Plaintiff's original complaint, and also (4) Exhibit 1 to Defendant's Motion, the "XIPC Price List," (Dkt. No. 46-2), for these documents are "integral to or explicitly relied upon in the complaint." In re Burlington Coat Factory Secs. Litig., 114 F.3d at 1426.

claim,'" (2) "the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth,'" and (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 556 U.S. at 675, 679).

## IV. ANALYSIS

### A. Breach of Contract

Defendant argues that Plaintiff's breach of contract claim should be dismissed because the Second Amended Complaint does not identify a contractual duty that Defendant failed to carry out or breached. (Mot. at 12.) Under New Jersey law, a cause of action for breach of contract lies where (1) the parties entered into a contract, (2) the plaintiff performed under the contract, (3) the defendant did not perform under the contract, and (4) the defendant's breach or nonperformance caused a loss to the plaintiff. See Goldfarb v. Solimine, 245 N.J. 326, 338 (2021) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016)).

The Second Amended Complaint identifies four "contracts" that Defendant allegedly breached: (1) the MPA, (2) the OEMA, (3) the Amendment, and (4) the "annual contracts" or invoices Plaintiff issued to Defendant. Defendant does not dispute that the MPA, OEMA, and Amendment are valid contracts. (See Mot. at 13–14.) The Court will therefore address whether Plaintiff asserted a claim under those agreements first.

#### i. Breach of the MPA

Plaintiff alleges that Defendant breached Sections 1.1, 9.3, and Schedule 1 of the MPA by installing and using XIPC software on Defendant's own multi-CPU computer systems during the development stage. (SAC ¶ 42.)

Section 1.1 of the MPA provides:

> ***License Grant.*** Subject to the terms of this Agreement, Envoy grants to Customer a nonexclusive, nontransferable license to install and use the Products for Customer's internal use at the Authorized Location described on a Schedule to this Agreement, any subsequent Schedules entered into by the parties or in a purchase order accepted by Envoy. This license will also extend to new Releases, Upgrades, and Error Corrections, which Envoy may provide to Customer as part of the Maintenance Services described in Section 5.

(Dkt. No. 14-2, MPA § 1.1.)

Section 9.3 is part of the "Definitions" section of the MPA and provides: "'*Developer's Toolset*' or '*DTS*' or '*SDK*' means that form of the Products identified in the Schedule(s) as licensed for use in a development environment." (Id. § 9.3.)

Schedule 1 of the MPA identifies the Authorized Location discussed in Section 1.1 of the MPA as 820 Park Two Drive, P.O. Box 765, Sugar Land, Texas 77487 and the "Products" mentioned in Sections 1.1 and 9.3 of the MPA as: "Reinstate* XIPC Developer ToolSet for WinNT on Group C Pltfm; V.3.3;" "Reinstate* XIPC Developer ToolSet for Win/95 on Group B Pltfm; V.3.3;" "Reinstate* XIPC Deployment Licenses for Group B Pltfms;" and "Envoy XIPC Deployment Licenses for Group C Platform." (Id. at Schedule 1.) Plaintiff alleges that "Group B and Group C computers are all single-CPU computers."[3] (SAC ¶ 43.)

Defendant argues that the breach of contract count should be dismissed because "Sections 1.1 and 9.3 are license grants to Cubic . . . and contain no obligations that Cubic could violate." (Mot. at 2.) Defendant further argues that "Schedule 1 is a license grant for 99 years but requires that Cubic pay fees. Envoy does not allege that these fees were unpaid." (Id.) In its opposition

---

[3] In its Motion, Defendant attaches a "XIPC Price List" that describes Group B platforms as "Windows 95, Windows 98" and Group C platforms as "Intel based Workstation (Win 2000, SCO, UnixWare, Linux), entry-level Unix workstation." (Mot., Ex. 1.) Even considering these descriptions, the Second Amended Complaint does not allege whether Defendant or its customers used computers outside of those listed on this document.

brief, Plaintiff maintains that Defendant breached the contractual provisions requiring Defendant to use XIPC on Group B or C platforms. (Opp'n Br. at 7–8.)

The Court does not analyze whether Sections 1.1, 9.3, and Schedule 1 of the MPA contain contractual obligations that Defendant could violate because Plaintiff simply has not plead facts to support its breach of the MPA claim in any capacity. The Second Amended Complaint is replete with conclusory allegations that "Cubic later began installing and using the XIPC software on multi-CPU computers in its development environment," (SAC ¶¶ 20, 43), with no facts pled to support such a conclusion. For example, Plaintiff alleges no facts to describe (a) the computers Defendant actually used in its development environment, (b) what "single-CPU" computers constitute a Group B or C platform, (c) how Defendant's computer use breached the MPA other than the vague allegation that Defendant used "multi-CPU computers" when it was only authorized to use "single-CPU computers," nor (d) when any breach occurred.

Plaintiff's bare assertions as to Defendant's use of multi-CPU computers "amount to nothing more than a 'formulaic recitation of the elements'" of a breach of contract claim, namely that Defendant breached the MPA by using unlicensed computers and Plaintiff would have made more money if Defendant contracted instead to use the unlicensed computers. See Iqbal, 556 U.S. at 681 (quoting Twombly, 550 U.S. at 555). "As such, the allegations are conclusory and not entitled to be assumed true." Id. Plaintiff did not sufficiently plead a breach of the MPA claim against Defendant.

      ii.    **Breach of the OEMA**

With respect to the OEMA, Plaintiff alleges that Defendant breached Section 8, paragraph 2 by delivering XIPC to "many customers that identified multi-CPU computers on which XIPC would be used." (SAC ¶ 45.)

Section 8, paragraph 2 of the OEMA provides:

> OEM will not deliver any Product(s) (including any portion of the Product(s) embedded in OEM's Applications) to any prospective customer without the prior receipt of a license agreement ('customer license') executed by the customer and reasonably satisfactory to Licensor, and unless the Product(s) have been authorized by Licensor for the use, computers and platforms identified by the customer. OEM will promptly notify Licensor of any material breach of a customer license that comes to its attention and will terminate any breached license if the breach is not curable or if it is not cured promptly after notice.

(Dkt. No. 14-2 at 9–10.)

Defendant argues that it did not breach this section because the Amendment did away with the tracking and reporting obligation and further because "Envoy's behavior regarding reports and sublicense agreements shows that it understood that OEMA [§] 8 was abrogated by" the Amendment. (Mot. at 16–18.) As previously stated in the Court's opinion on Defendant's first motion to dismiss, the Court is not persuaded that the Amendment "did away" with all requirements in Section 8 of the OEMA. (See Dkt. No. 41 at 5.) In its opposition, Plaintiff argues that the requirement to "track and report Deployment Licenses, was extinguished in the Amendment," (Opp'n Br. at 16), but that the requirement to "not deliver any Product(s) . . . unless the Product(s) have been authorized by Licensor for the use, computers and platforms identified by the customer," (id. at 15–16), remained. The modification to the track and report requirement clearly makes it impossible to know whether a customer used XIPC on an unlicensed computer and Plaintiff makes no specific allegation that Defendant installed XIPC on a customer's unlicensed computer. While the Amendment modified OEMA § 8 to abolish the tracking and reporting requirement, as this Court previously held, it did not change the other requirements of the OEMA. Nevertheless, Plaintiff has simply failed, as described below, to allege any facts as opposed to conclusions which demonstrate that Defendant in fact did violate these other

provisions. The Second Amended Complaint still fails to set forth a plausible claim that Defendant breached this section of the OEMA.

The Second Amended Complaint contains no facts supporting the naked assertion that Defendant delivered the XIPC software to customers that would use the software on unlicensed computers. It also contains no facts to support the conclusion that Defendant "knew" its customers would use XIPC beyond the scope of the license nor any facts to support the allegation that these unspecified customers "identified multi-cpu computers on which XIPC would be used." (See SAC ¶¶ 24, 45.) Further, the Second Amended Complaint contains the same deficiency that the first amended complaint had—Plaintiff makes no factual allegations as to these alleged "customers" apart from one instance.[4] Plaintiff thus fails to state a claim as to Defendant's breach of the OEMA.

### iii. Breach of the Amendment

Plaintiff alleges that Defendant installed and used XIPC on the computers of its customers during deployment, which violated the Amendment's restriction to deployment on "Single-CPU computers." (Id. ¶ 44.) The Amendment identified the "Product Name" as "Annual License for Unlimited XIPC Deployments for WinNT/95 Single-CPU Computers" and also modified OEMA § 8's tracking and reporting requirement by including the language that "Naztec, Inc. is not required to Track or Report on its Deployment of XIPC Licenses." (Dkt. No. 14-2 at 13.) Plaintiff's allegations as to Defendant's breach of the Amendment are plainly insufficient and "devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557). There is no allegation as to what computers Defendant or its customers used that did not comply with the Amendment's limitations. For the same reasons Plaintiff's claim that Defendant

---

[4] The one "customer" as to which there are any factual allegations is the City of Carlsbad, and as discussed below, the factual allegations made with regard to the City of Carlsbad are patently insufficient to support any cause of action.

-11-

breached Section 8, paragraph 2 of the OEMA fails, so does Plaintiff's claim that Defendant breached the Amendment.

    iv.    Breach of the "Annual Contracts"

Plaintiff also alleges that Defendant breached a fourth contract, the "annual contracts," when Defendant accepted its "offer" and installed, used, and deployed XIPC on multi-CPU computers of its customers. (SAC ¶ 48; Dkt. No. 45-2, Ex. A.) Defendant argues that the "annual contracts," "on their face . . . are just invoices, and nothing on them suggests that they are agreements," noting that "Envoy's 1st Amended Complaint candidly represented that these same documents were invoices." (Mot. at 35.) While Plaintiff's opposition offers further explanation as to how these documents constitute yearly contracts, (Opp'n Br. at 4–5), the Second Amended Complaint's assertion that the "annual contracts" constitute valid contracts is a legal conclusion the Court need not accept as true. "[C]ourts are not required to credit bald assertions and legal conclusions in the complaint. Stating that a contract was breached is stating a legal conclusion." Chemtech Int'l, Inc. v. Chem. Injection Techs., Inc., 170 F. App'x 805, 808 (3d Cir. 2006). Even if the Court were to accept Plaintiff's allegations that the yearly invoices attached to the Second Amended Complaint as Exhibit A constitute annual contracts, Plaintiff provides no factual support for the conclusory allegation that Defendant breached these "annual contracts" by using multi-CPU computers.

As Plaintiff failed to allege any fact to support its conclusory assertions that Defendant breached the MPA, OEMA, Amendment, and the "annual contracts," Plaintiff's breach of contract claim is dismissed.[5]

---

[5] Plaintiff also alleges that the discovery rule and equitable tolling apply to its claims, (SAC ¶ 40), but Plaintiff has not plead anything that warrants the application of either here. As was the case with the First Amended Complaint, the Second Amended Complaint likewise contains

## B. Copyright Infringement

Defendant moves to dismiss Plaintiff's second count for copyright infringement by arguing that it did not infringe Plaintiff's copyright because it is licensed to use Envoy's software on its "'Group B Pltfrms' and 'Group C Platform' computers for 99 years starting on September 25, 2001" until September 25, 2100. (Mot. at 19.) Plaintiff alleges that Defendant infringed its copyright by using XIPC on unlicensed multi-CPU computers in its development environment and by installing XIPC on its customers' multi-CPU computers without a license. (SAC ¶ 50–51.) Defendant argues that Group B and Group C platforms included certain multi-CPU computers but even so, Plaintiff's claim fails because Plaintiff never explains what computers Defendant used that violate the terms of the License nor how or when Defendant violate the license. (Mot. at 19.) The Court agrees with Defendant.

A claim for direct copyright infringement requires a plaintiff to establish "(1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work." Kay Berry, Inc. v. Taylor Gifts, Inc., 421 F.3d 199, 203 (3d Cir. 2005) (citation omitted). While the Court accepts as true the fact that Plaintiff owns a valid copyright in its XIPC software, Plaintiff's conclusory allegations that "[u]pon information and belief, Cubic is using, and has used, XIPC for years on multi-cpu computers in its development environment, which computers are not Group B or Group C computers per the License, and which are thus unlicensed," (SAC ¶ 50), and "Cubic

---

no allegations of Plaintiff's reasonable diligence to investigate a cause of action in the twenty plus years the parties have been contracting with one another to invoke New Jersey's discovery rule. See Peck v. Donovan, 565 F. App'x 66, 70 (3d Cir. 2012) (quoting County of Morris v. Fauver, 153 N.J. 80, 110 (1998)).

Moreover, Plaintiff's scant and conclusory allegations as to Defendant's "fraudulent misrepresentations and omissions" that it would use XIPC on single-CPU computers and yielded a $50,000 annual profit from its use of XIPC, (see SAC ¶¶ 29–40), lack the particularity required by Rule 9(b). See Fuqua v. Bristol-Myers Squibb Co., 926 F. Supp. 2d 538, 549 (D.N.J. 2013). There is no colorable basis for equitable tolling here.

-13-

has also itself installed and used XIPC on its customers' multi-CPU computers," (id. ¶ 51), are not "entitled to the assumption of truth." See Santiago, 629 F.3d at 130 (citation omitted). Plaintiff's lack of "further factual enhancement" to its claims "stops short of the line between possibility and plausibility." Twombly, 550 U.S. at 546.

As discussed, the Second Amended Complaint does not explain what computers fell into the "Group B or C platform" description, does not describe the computers Defendant used that infringed Plaintiff's copyright, nor explain when or how the allegedly infringing computers were used other than through vague and conclusory statements. See, e.g., Levey v. Brownstone Inv. Grp., LLC, 2013 WL 3285057, at *6 (D.N.J. June 26, 2013) (dismissing direct copyright infringement claim when "Plaintiff has not demonstrated by what specific acts and during what time Defendants infringed the copyright"), aff'd, 590 F. App'x 132 (3d Cir. 2014). Plaintiff's factual and conclusory allegations do not "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. Thus, Plaintiff's direct copyright infringement claim is dismissed.

C. **Vicarious Liability for Copyright Infringement**

Defendant next argues that Plaintiff's claim for vicarious liability for copyright infringement should be dismissed because Plaintiff fails to plead control or a direct financial interest. (Mot. at 20.)

"A plaintiff alleges a claim for vicarious copyright infringement when he alleges that the defendant 'has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities.'" Live Face on Web, LLC v. Emerson Cleaners, Inc., 66 F. Supp. 3d 551, 556–57 (D.N.J. 2014) (quoting Parker v. Google, 242 F. App'x 833, 837 (3d Cir. 2007)).

Here, the infringing activity alleged is that Defendant's "customers" purchased a product that incorporates Plaintiff's copyrighted XIPC software and used such product on unlicensed multi-CPU computers "outside the scope of any license Envoy granted." (SAC ¶ 58.) This is a conclusory allegation that is not entitled to the presumption of truth. So too is the allegation that Defendant installed and used the XIPC software on its customers' multi-CPU computers and "instructed and trained its customers on how to use the XIPC software" on those unlicensed multi-CPU computers. (Id. ¶ 55.) The Second Amended Complaint contains no factual allegations about who Defendant's customers were (other than the City of Carlsbad), what product Defendant's customers bought, what computers these customers used that were outside the scope of a license, nor when any of these infringing events happened. And, as discussed below, the Second Amended Complaint does not explain how the City of Carlsbad infringed Plaintiff's copyright. While Plaintiff's opposition brief argues that the "servers in SAC Ex. B are multi-CPU servers," (Opp'n Br. at 13), and the parties debate the definition of "server" in their motion papers, (see Reply at 6–7), this debate is irrelevant. The Second Amended Complaint does not explain that the device used by the City of Carlsbad was an unlicensed multi-CPU computer even though they had every opportunity to do so. Plaintiff's allegations fall short of giving Defendant the "fair notice of what the . . . claim is and the grounds upon which it rests" as Rule 8(a)(2) requires. See Twombly, 550 U.S. at 555 (citation omitted). The underlying infringement of Plaintiff's vicarious infringement claim is inadequately plead and is thus cause for the dismissal of this claim.

Plaintiff's remaining allegations likewise fail to plead facts that set forth a plausible vicarious infringement claim. As to the control element of this claim, Plaintiff alleges that Defendant "had the right, ability, and even the obligation, to supervise or control the infringing activity of its customers" under OEMA § 8 because "Cubic was required to refrain from delivering

the XIPC software to any prospective customer unless the 'Product(s) have been authorized by the Licensor for the use, computers, and platforms identified by the customer.'"  (SAC ¶ 56.)

Defendant again argues that the Amendment abrogated the OEMA § 8 requirements and Plaintiff never acted like those requirements were in force "all these years," (Mot. at 22), and the Court remains unpersuaded that the Amendment did away with all seven paragraphs of OEMA § 8.  Nonetheless, the issue remains that there are no facts alleged about whether Plaintiff, as "Licensor," received or authorized any sublicense agreements between Defendant and its customers "for the use, computers and platforms identified by the customer" as set forth in OEMA § 8.[6]  Plaintiff's inability to adequately plead this cause of action is a direct result of its agreement not to require reports or its authorization of any sublicense agreements from Defendant.  The control element is thus insufficiently plead.

Finally, to establish a "direct financial interest" Plaintiff alleges "[u]pon information and belief, had Cubic informed its customers that use of its product with the XIPC software was allowed only on single-CPU computers, many of its customers would not have purchased the Cubic product . . . and Cubic would have lost the money it earned from such customers . . . ." (SAC ¶ 57.)  This allegation is pure speculation and comes nowhere close to establishing whether Defendant had a direct financial interest in the infringement of its customers.

Plaintiff's vicarious infringement claim is thus dismissed.

---

[6]  In its opposition, Plaintiff argues that it "intentionally waived" "the right to reject unreasonable customer licenses" and that it is suing Defendant for breaching the obligation to "not provide the XIPC software to customers that had indicated to Cubic they would use it on an unauthorized platform." (Opp'n Br. at 18.)  That clause, however, is still subject to the approval of the "Licensor," *i.e.*, Plaintiff, and there is no allegation as to whether Plaintiff provided any such authorization.

### D. Copyright Infringement by Inducement

Defendant moves to dismiss Plaintiff's count for induced copyright infringement on the grounds that Plaintiff failed to identify (a) a direct infringer, (b) Defendant's actual knowledge of specific acts of infringement, and (c) Defendant's intent to induce a third party to infringe. (Mot. at 28–30.)

To state a claim for contributory infringement by inducement, "a plaintiff must show: (1) a third party directly infringed the plaintiff's copyright; (2) the defendant knew that the third party was directly infringing; and (3) the defendant materially contributed to or induced the infringement." Leonard v. Stemtech Int'l Inc., 834 F.3d 376, 387 (3d Cir. 2016). "Thus, to prove a claim of contributory or vicarious infringement, a plaintiff must first show direct infringement by a third party." Id. at 386. Plaintiff has not done so. Plaintiff merely alleges that "[m]any of Cubic's customers . . . used the XIPC software on multi-cpu computers without a license to do so, and thus infringed the XIPC copyrights." (SAC ¶ 63.) This allegation fails to satisfy Rule 8 for the same reasons Plaintiff's direct infringement allegations fail. There are no facts alleged to show who these customers are, what they purchased from Defendant, what computers constitute an infringing computer, what computers these customers used that were beyond the scope of the license, and when any infringement took place.[7]

The one customer example identified in support of Plaintiff's induced infringement claim also lacks the specificity required to set forth a plausible cause of action. (See id. ¶ 65.) Plaintiff

---

[7] While Plaintiff's opposition asserts that it "discovered [that] Cubic delivered a system with XIPC installed on a 6-CPU computer to another customer" while preparing its opposition brief, (see Opp'n Br. at 25 n. 9), Plaintiff could have requested leave to replead to include this allegation in a complaint for the Court's consideration but did not. Nevertheless, the Court will grant Plaintiff the opportunity to make a motion to file a further amended complaint—but only to the extent that such a proposed amended complaint is directed solely at this "newly discovered" installation.

alleges that the City of Carlsbad in California "purchased a Cubic system that, upon information and believe [sic], includes both a multi-cpu computer and XIPC installed on it" and that "Cubic also was using that system itself to provide training services to that customer." (Id.) Plaintiff, however, pleads no facts to support these allegations nor does Plaintiff sufficiently explain how Exhibit B supplements these allegations.

For example, the first two pages of Exhibit B contain a June 12, 2018 two-page Resolution by the City Council of the City of Carlsbad announcing a master purchase agreement between Carlsbad and "Trafficware Group, Inc." ("Trafficware"). (Id., Ex. B.) Plaintiff does not explain the connection between Trafficware and Defendant nor how this resolution supports its claims. Pages 3 to 9 of Exhibit B consist of a Master Purchase Agreement between Trafficware and the City of Carlsbad and a Certificate of Acknowledgement by the State of Texas. Again, Plaintiff pleads no fact to explain how these documents support its claims against Defendant. The remaining pages of Exhibit B appear to be a "Vendor's Bid" with seven phrases highlighted. Plaintiff does not explain what these pages mean, why these terms are highlighted, nor what significance, if any, the terms have to the present action. The Court can only assume Exhibit B has any relevance to this action because Naztec, Defendant's predecessor to the License, is listed on the Vendor's Bid, but the Second Amended Complaint contains no facts to support such an assumption. And "[w]hile a plaintiff may rely on the court to draw all reasonable inferences in his favor at the Rule 12(b)(6) stage, a plaintiff who relies on the court to fill in the blanks for all of the information missing in his complaint does so at his peril." Chemtech Int'l, Inc., 170 F. App'x at 808. This is Plaintiff's Second Amended Complaint, yet Plaintiff made no effort to investigate or explain its underlying claims. The induced copyright infringement claim is thus foreclosed by

-18-

Plaintiff's failure to plausibly allege any facts to establish a third party's direct infringement. See Tanksley v. Daniels, 902 F.3d 165, 177 (3d Cir. 2018).

Plaintiff also fails to allege facts demonstrating that Defendant knew of a third party's direct infringement and induced such infringement. Rather, Plaintiff alleges in a conclusory fashion that Defendant "knew at the time it supplied the XIPC software to its customers that the customers would use it on multi-cpu computers, and that such use was not licensed and infringed Envoy's copyright rights." (SAC ¶ 64.) While possible that Defendant could have known what computer its customers used, there are no facts pled to make it plausible that a third party used an unlicensed computer and Defendant knew of that infringing activity. This allegation and the allegation that Defendant "materially contributed to and induced the infringements of its customers by purposefully providing the XIPC software to them without any restriction on its use under the parties' License, absent which the customers would not have been able to infringe Envoy's copyrights," (id. ¶ 67), amount to "nothing more than a formulaic recitation of the elements" of this cause of action. See Santiago, 629 F.3d at 132 (quoting Iqbal, 556 U.S. at 681). There are no facts alleged that push this claim from possible to plausible and will therefore be dismissed.

\* \* \*

For these reasons,

**IT IS** on this 15th day of May, 2025

**ORDERED** that Defendant's motion to dismiss Plaintiff's Second Amended Complaint, (Dkt. No. 46), is **GRANTED**.

/s/ Stanley R. Chesler
Hon. Stanley R. Chesler, U.S.D.J.